Case Numbers 21-4072, 22-3351, 23-3196, and 23-3366 Dayton Power and Light Company and American Electric Power Service Corporation v. FERC Argument not to exceed 20 minutes for Petitioners and 20 minutes to be shared by Respondent and Intervenor Mr. Price you may proceed for the Petitioners. Your Honor, I may have pleased the Court. Matthew Price arguing on behalf of Petitioners AEP, Dayton Power and Light, and First Energy. FERC refused to approve an RTO participation adder for Dayton and took away the adder for AEP it previously granted. It decided that the Federal Power Act required it to deny the adder because of an Ohio law mandating RTO membership. These orders should be reversed. First, FERC relied on a flimsy procedural ground, the Collateral Attack Doctrine, to avoid grappling with the plain text of Section 219C which does not allow FERC to deny an adder based on the reason why a utility joined an RTO. The statute requires FERC to award an incentive for each utility that joins an RTO, not for a utility to join an RTO. Second, FERC remarkably refused even to consider whether the Federal Power Act preempted the Ohio law and this Court should reverse FERC's order because it rests on the legally invalid premise that a state may mandate RTO membership. A state cannot require a utility to give operational control of federally regulated transmission facilities to a third party and FERC may not make its application of the Federal State Law. We have other arguments in our brief as well, but I'd like to start with the text of the statute if I may and then turn to preemption. The other side's argument on the text of the statute centers on the word incentives. Can I ask you a preliminary question? I take it FERC is not opined on either the preemption question or on the impact of the statute on Order 679 and the voluntariness issue. Should we have them do that first? Well, we don't think that's necessary. We think it's clear. We think the statute is clear and we think preemption is clear. If you would like to ask for the views of FERC, obviously we have no objection to that, but we don't think it's necessary for the Court to decide the case. This isn't a situation in which the Court would be deferring to FERC's interpretation of either the jurisdictional bounds or what Section 219C means because, again, we think the Federal Power Act generally is clear about the bounds of federal jurisdiction and Section 219C text is clear. In any event, the concept of deference to agency interpretation is under review in the Supreme Court right now. We'll see where that ends up in another couple of months. With respect to the text, the other side's argument centers on the word incentives, but they fundamentally understand what the incentive is primarily for. It's not an incentive for each utility to join the RTO. It's an incentive to each utility that joins, and the behavior that's being incentivized is to build more transmission facilities. That was Congress's overriding goal. Let me explain why the ROE Adder does that. Utilities receive a regulated rate of return on their invested capital. If you have a higher return on your equity, that means you make more money from building transmission facilities that are your invested capital. So you have more incentive to put your money into transmission facilities as opposed to other things you can do with that money, whether it's paying dividends or building other kinds of facilities that are not transmission facilities. That's what Congress was trying to accomplish. But how can something be an incentive if you're required by law to do it? Nothing requires utilities to invest in transmission facilities. That's a discretionary decision. They're required by law, assuming that the Ohio law is valid, they're required by law to join a transmission organization. So how can you have an incentive, I'm going to use the word to, I know you're going to jump on it, to join if you are required to join? Well, I will jump on it, Your Honor, because, and the reason is, this is really critically important. That's not what Congress was trying to incentivize. The statute isn't about let's make sure people have an incentive to join RTOs. The overall purpose of the statute is to make sure utilities are putting more money into transmission facilities because Congress perceived there wasn't enough money there. And what Congress was trying to do was say, we want all utilities that are members of RTOs to devote more of their scarce capital to transmission facilities as opposed to other uses of that capital. That's what it was trying to accomplish. That's what Congress meant to do. Where do you go to find that out? I go to the text of Section 219A, Your Honor, and what 219A says, it speaks expressly about purpose. It says the commission is directed, and you can follow along on page 89 of Firk's brief if you don't have the statute in front of you. It says that the commission is directed to establish, quote, incentive-based rate treatments for the purpose of benefiting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion. In other words, Congress perceived that there were not enough transmission lines. There was congestion on the lines that prevented the efficient transmission of power. Mr. Price, that quote that you just read from subsection A, it seems to include some very technical language, right? It says incentive-based, including performance-based rate treatments. Does that have a specific meaning within the energy industry? Like, what is an incentive-based or a performance-based rate? Is it a rate that you just get extra money without having to meet a particular standard? It means if you do something, you get more money for it. That's right. But, again, what So A, right, like this is the broad part. They have to establish by rule these incentive-based or performance-based rate treatments. C, which is the part about, you know, utilities that join an RTO or other transmission organization. But do you read the statute that C is subsumed with an A, that they all have to be incentive-based or performance-based rate treatments? Well, I read A to talk generally about FERC's requirement to make rules to set up incentive-based treatments. And it did that. They shall establish by rule, right, incentive-based, including performance-based rate treatments. C is a type of that. C is a particular example that Congress wanted to make sure that FERC included. Right. So C needs to be an incentive-based or a performance-based rate treatment. That's right. But the incentive, again, is Okay. And you just told me, tell me one more time, what is an incentive-based rate treatment? You get a higher rate if you do something. Sure. So let me give you an example. So here you get a higher rate if you join an RTO. You get a higher rate if you join an RTO. But, again, Congress isn't trying to incentivize utilities that join RTOs just to join RTOs. The behavior that Congress is trying to incentivize is to build new transmission. And one way of doing that is to say, if you're an RTO, all members of RTOs, guess what? We're going to give you this extra ROE when you devote your capital building transmission. But they have to use that extra ROE to build on transmission? Well, that's the only way they get it. It's an ROE on their transmission investment. So they get an extra 50 basis point of return when they invest money in transmission infrastructure. That is exactly what the ROE adder does. They get more profit than they would have otherwise absent this adder when they spend their money on transmission infrastructure. Right, right. They get more profit than they would have. I just want to understand. They get more profit than they would have otherwise absent this rider. And they have to use that  No, no, no. So let me explain. So let's say I have $100 to invest. If I invest it and let's say I have a base ROE of 9%. Okay, I invest it in transmission infrastructure. I earn $9 of profit on that $100. Now the incentive comes along and says, we want you to actually devote more money there. We want you to devote $200 instead of $100. So we're going to give you 9.5% instead of 9%. So now when I invest that $100, I get $950. And when I invest another $100, I get $950. So that's what Congress was trying to accomplish, to lead companies to invest more in a transmission network that Congress felt was not adequate to efficiently transmit energy across large regions. And that is why it wrote the text of Section 219 the way it did, which is to give the adder to each utility that joins. Because the behavior it was trying to incentivize was investing money, not joining an RTO. And if you look at other incentives under Section A, for example, an incentive to recover the cost for abandoned or canceled transmission projects. That's an incentive FERC set up. Well, FERC isn't trying to incentivize abandonment and cancellation of projects. No, FERC is trying to incentivize transmission investment and recognize by giving that incentive that lowers the barriers to investment and leads more investment in transmission infrastructure. So that's what Congress was trying to accomplish and what FERC was trying to accomplish in A, and what Congress was directing FERC to accomplish in subsection C. And one more point about the meaning of the statute, which is Section 219B, which describes other goals Congress had in the statute to promote economically efficient transmission, to provide a return on equity that attracts new investment in transmission facilities, and promote capital investments. Inducing investments by all RTO members promotes those goals, but taking away an adder from an RTO member undercuts those goals, because it creates an uneven playing field for investment within an RTO where one utility gets an adder and another doesn't just by the happenstance of whether their state requires membership. And all utilities take on similar risks when they join an RTO, and more importantly all provide similar consumer benefits in terms of expanding a more efficient grid. And there's no indication that Congress wanted to place some utilities in an RTO at a competitive disadvantage in scarce capital as compared to others, and that would really encounter Congress's goal, again, to get each utility that adjoins an RTO to invest more of their money in transmission infrastructure, which is what the incentive is designed to induce. So that's my argument about the text. I do want to talk about preemption for a few minutes before I sit down, unless there are other questions about the statute. I mean it just seems odd to me that the word incentives is in Section C. It's titled incentives, but you're saying it has nothing to do with joining, even though that seems to be a more natural reading. And if we look at incentives, and you're saying, I'm just not sure A, what other evidence do we have besides A and what you just said, and B, I mean I guess you're saying that's enough, but I don't. Besides the text of A, which expressly describes Congress's purpose, all the discussion in B, which is focused on encouraging transmission investment, and a text in subsection C, which says to each utility that joins, not utilities to join, I think that the evidence is overwhelming, frankly, that Congress intended our reading of the statute. Is there a legislative history? We don't, we aren't aware of legislative history that would shed light on this issue, no. Can I ask another question about the Deaton power proceedings? Yeah, sure. My understanding was that in addition to the RTO adder under subsection C, there were other adders, other transmission programs that Deaton applied for, is that correct? I believe that's right, and there are a number of other incentives that FERC promulgated by rule, like the cancellation incentive that I just mentioned. So FERC provided other incentives for utilities that join RTOs? Other incentives for utilities generally, and Congress in subsection C said, in particular when you're a member of an RTO, we want to provide those utilities an additional incentive to build beyond other incentives that may also exist for everyone. Well, it says that you're to provide incentives for each utility that joins, aren't they provided with other incentives? Well, no, your honor, subsection C is specifically about the RTO adder, that is an incentive that FERC has set up to implement subsection C. Other incentives are available to all utilities, whether they're members of RTOs or not. I don't know that, so you're saying that CS has, you have to get incentives that other people don't get? If you're a member of an RTO, it says that Congress wants to provide incentives for each utility that joins an RTO, that's right, and FERC has understood that to mean an extra 50 basis points. I don't think anyone is arguing that because there are some other incentives, RTO members don't get, can't get an RTO adder that Congress has made available specifically to, that FERC has made available to specific utilities that join RTOs. Right, but the FERC, well, I guess FERC doesn't argue for, the intervenors for FERC, you know, doesn't argue that it is to incentivize people to join, and you're presenting a reading that just says, well, there has to be incentives for each utility that joins, and it does indeed seem like there are incentives for each utility that joins, not to join, but you've just told me that the statute doesn't say to join. It doesn't say to join, it says for each that joins, that's right, related to their RTO membership. I mean, Congress, there's no doubt Congress liked RTOs because RTOs are very efficient at planning transmission and transmitting energy across long distances, so Congress liked RTOs. Right, they like them, and that's why they want to incentivize people to join them. They're happy to have people join them, it may instigate them, but that's not the statute Congress wrote. What Congress wrote is it wanted to really drive investment by RTO members, and that is why Congress wrote the statute using the words it did, to each utility that joins the RTO gets this to motivate them to invest. It didn't want some utilities and RTOs to invest more, others it didn't care about. No, it wanted all utilities and RTOs to vote more capital to transmission investment. Just one clarifying, are there transmission utilities that would not apply for the rider, the adder, because they don't want to invest more in this area because it would require them to do more? It doesn't, having the adder doesn't require them to make any investment, it just induces them because it's more profitable than it would otherwise be. If I could just... It's not tied to a particular investment at all? That's correct, it's not tied to a particular investment, all investments, their rate base gets the incentive. You could address preemption, that would be great. Okay, thank you so much, Your Honor, I appreciate it. Well, another reason why her reading of the statute is right is because Congress didn't intend for states to regulate in this area at all. The Ohio statute intrudes on the domain that Congress has reserved exclusively for FERC. FERC has jurisdiction over all facilities for transmission of electric energy and interstate commerce and the Ohio statute aims directly at the heart of that domain. It regulates, quote, transmission facilities as defined under federal law, it mandates that the owner, quote, transfer control of those facilities to an RTO that is regulated by FERC. So we think that this is a very clear... Is the Ohio law different from the law of the other states that require joining an RTO? Yes, all the states, I haven't canvassed them all, Your Honor, but I think the different state laws have different wrinkles. Are they significant vis-a-vis the issues here? I haven't analyzed them in depth to really know. I can tell you that, for example, in California, following the CPUC decision, the California Commission had said California requires RTO membership and then FERC on remand said actually we don't think it does. And so the point is... My understanding is that there are approximately, feel free to correct me, but there are approximately seven states that do require joining an RTO and I was just wondering whether the Ohio statute was significantly different from those. We could say, if we were going to decide preemption, could we say that the Ohio statute is preempted or would that mean that all the seven state statutes are preempted? Well, I haven't analyzed the other states. I think all the court needs to say is the Ohio statute is preempted and what that means for the other states, I think, is left to litigate if those issues arise. And the preemption point, can I answer that question? Yes, I think we should, yeah. Okay, excuse me. Can you just address kind of the intersection between the PURPA, the P-U-R-P-A exemption? It seems like if there are state laws that are interfering with what FERC or Congress wants to accomplish in this area, then there's a process for having an exemption, right? And making them more on a piece-by-piece basis, you're arguing that no, that it's field preempted. Let's drill down on what that PURPA provision says. I think it's actually quite helpful to us. It's 16 U.S.C.A. 24A-1 and what it does is allow FERC to preempt a state prohibition on voluntary coordination. So let's say a state says, we want to protect our jurisdiction over your transmission facilities so we're not going to allow you to interconnect with the interstate grid. This isn't hypothetical. Texas, a portion of Texas is actually cut off from the interstate grid. So what this statute says is if a state tries to protect its jurisdiction by prohibiting interconnection, FERC can preempt that law. But once the utility is connected to the interstate grid as Ohio's are, well then it's FERC jurisdictional and FERC has exclusive jurisdiction over transmission facilities. But that doesn't cover what Ohio is doing, doesn't it also, isn't Ohio preventing the voluntary coordination by mandating it? Well I do agree with that, your honor. That's our conflict preemption argument is exactly that and I do agree with that. Has anybody used it that way? I mean has there ever been, I mean I take it, I take it that none of the seven states where it's been mandated, has anybody come in and said you can't do that? No, I think that's right because generally utilities are happy to join RTOs and I don't know of situations where utilities have joined under compulsion or duress and that's certainly true for the clients I represent. So there's never really been an injury resulting from these state statutes before now. May I address the issue of whether FERC should talk about preemption at all in this decision or would you rather me sit down? If you want to make one more minute of statement, we're going to give the other side equal time of course. Okay, thank you, your honor, I appreciate it. I think the basic reason why the issue can't be ignored is for one thing FERC can't rely on annullity. A preempted law has no force in effect and if we're right about the merits, then by relying on state law, FERC necessarily is acting contrary to law. Another way to think about that is, well what did Congress intend in section 219C, did it intend for FERC to deny incentives on this basis? And to answer that question, you can't just look narrowly at the text of 219C, but you have to look at the Federal Power Act as a whole that Congress enacted and if Congress preempted this state law, then it's not something that Congress wanted FERC to rely on in crafting incentives under section 219C. A third way of looking at it is... Do we hold that the statute is not preempted for purposes of this case but leave open any questions about whether for other purposes the statute would be preempted? In other words, whether it would conflict with other FERC mandates, requirements, policies or whatever? Well, I suppose it could be preempted for reasons that we don't argue, so in that sense that's right. But... You could have a narrow decision that for purposes of this case it's not preempted. Yeah, I would prefer a narrow decision that for purposes of this case the statute is preempted. And again, I think that that would be narrow in the sense that the decision is really for purposes of FERC's own rate determinations, it can't rely on a statute that Congress didn't intend for it to consider because it was preempted. That's a very narrow way of writing the decision that doesn't enjoin anything, it leaves open for another day other state statutes, it's a narrow way of crafting this decision to read... That would allow any utility to drop out of the RTO here? I think, well, I think what would happen is if that happened, there's no injunction against the state, the state could try to enforce that law and then there would be a proceeding as to whether the state could enforce that law, I think the state would have a hard time overcoming this court's ruling. This happens all the time, for example, in instances where defendants raise preemption as a defense to a tort claim, for example, where courts reach decisions about whether a state law is preempted or not outside the context of any enforcement proceeding by the state itself. And I think the same is true here, for AP this is a defense to the complaint that was filed against it by the OCC. Thank you. All right, thank you very much. Good morning, may it please the court, I'm Carol Banta for the Federal Energy Regulatory Commission and I have shared four minutes of my time with Mr. Lindgren for the Public Service on the preemption issue. But I'll begin with just a couple of quick notes about FERC's role with regard to preemption. Going back to Judge Nelbandian's question, no, even if you disagree or even if you, there's no need to remand this case to FERC to get its views on preemption because there's no deference if the commission did have views on preemption and it can't invalidate the Ohio statute. So the commission acted reasonably within its... But wouldn't the, I'm just curious and I suppose I don't mean to argue against you, your FERC on this, but wouldn't you, could there be some things that you have in your expertise about how the state and federal laws are supposed to work together that would be within the province of the agency that might be helpful to us? I'm not saying it would be, but I'm just curious. The commission sometimes participates as an amicus or I think maybe an intervener in court cases on preemption, but it doesn't have to. And in this, it was appropriate here to just take, as the commission said, we take the law as it is in effect. And I will amend one position that we took in our brief. While we continue to believe that the court need not reach the preemption issue, we're no longer saying whether the court should or should not because that's up to the court. We don't have a position on that. Our only position is that it was reasonable for FERC not to address that in these orders and that it doesn't need to be remanded to FERC if the court decides to address the merits now that we have the state of Ohio or the PUC of Ohio represented by the Attorney General's Office here to defend its statute. I guess the question that I have on preemption is whether if we were to say the Ohio statute is or is not preempted, would that have implications for other cases and other situations such that we should be reluctant to issue an opinion without knowing all of these intricate interrelationships? And candidly, I also don't know what the other state laws say that might be similar or different. I suspect that they're probably all a little bit different coming from different states. We really didn't get into that in the briefing, so I don't know. I do have one thing to add. California has since changed its law, and I believe that that was a statute rather than something from the PUC, but I can't swear to that. But I know that they've changed their law at least with regard to three of their largest investor-owned utilities. And so in a recent order, although it is not yet final because it's pending or hearing before the commission, but even though the commission in the California 2 case looked at the state law at the time and concluded that PG&E's participation was voluntary and it was upheld on the second California appeal, it has in a more recent order removed the adder from at least one, I think it was PG&E again, based on that change in California law. So even among the states, the law may be somewhat in flux, and I don't assume that they're like Ohio. Do you have the order number, the FERC order number? I know it's on rehearing. Oh, I can submit a letter with that because I had a copy of it and I didn't bring it with me. Because again, it is pending on rehearing. The commission could, until the commission acts on rehearing, that's not final. It's just a recent development. Well, California having changed its law is something that did happen. The commission's outcome on that is still in process. But moving aside from preemption, I also want to begin with the commission's rulemaking in Order 679 because it is not the case that the commission has not spoken to the statute. The commission didn't want to speak to it again in these orders because it had spoken to it before. And so we have to consider the commission's reasoning in a line that begins with the Section 219 statute, which the commission did interpret in Order 679. So in these orders, the commission was saying, we stand by what we said in 679 and we're applying it here. But that doesn't mean the commission didn't interpret the statute, it just didn't reopen the issue in these orders. And so looking at what the commission did in Order 679, I'll focus on two aspects in particular of the commission's interpretation of 219, which go hand in hand. And one is, as discussed previously, the provision in Section 219A emphasizes that this is all for the purpose of benefiting consumers. And that's nothing new. The commission had been experimenting with rate incentives, and this also goes to the meaning of what incentive is. The commission had been experimenting with rate incentives since at least 1992 in a policy statement, which we haven't really discussed here because the rulemaking supersedes that. But it is quoted in the orders because the California court had quoted from that policy statement that's the background of all of this. And I'd note that the D.C. Circuit in both San Diego and International Transmission, so pretty much all the cases that have substantively addressed incentives, all pointed to the 1992 policy statement. So I'd look, for instance, at paragraph 30 of the Dayton order, the first order. This is JA 185. There's a block quote from the California court, but the California court itself again was citing the commission's own policy toward incentives dating back to 1992. Rate incentives must be prospective, and there must be a connection between the incentive and the conduct to be induced. And that's because the commission had said for quite some time that incentive rate making must be prospective because it's not designed to reward past efficient cost-saving behavior. To do so would violate the objective of benefiting customers. But, so your friend on the other side says the, what the conduct that's being induced is transmission infrastructure investment, not joining the RTO. Well, in 219C that's not correct. Certainly all of these incentives and a lot of the incentives that have nothing to do with the RTO adder do go to transmission investment. Now the RTO membership also includes things like the efficient operating of the system, which goes to the word about, some of the language about ensuring reliability. But if we look at order 679, when the commission was interpreting the statute there, it was focusing on what section C means. What does incentive mean? What is it incentivizing? What is it inducing you to do? And in that rule making there was some question about whether it should only be for new members that hadn't joined yet, or whether joins should be construed to include existing members. Like I believe all of the transmission owner petitioners in this case, if I'm not wrong about that, existing members who had already joined, they had already done the thing, but should they get the adder? And the commission said they should on the theory that they are induced to stay because staying is generally voluntary. Because otherwise you might join and then leave once you got the... I understand that the commission has interpreted it that way, but what does the statute mean? Other than that, is that the best reading of the statute? Okay, fine, the agency says... You're saying to me, okay, the agency has interpreted this to mean it's an incentive to join or remain in the RTO, okay? Your friend says, wait a minute, it says that joins, I mean we're putting a lot on that, but it says that joins, not to join, and if it were an incentive to join, it would say to join, so the agency's reading of the statute is just incorrect to the extent that it's doing that. I mean, what's your response to that and his argument about the structure of the statute and how it supports his reading? Well, I think when we look at the language of the statute, the word incentives and even the word joins, but the word incentives doesn't answer a lot of questions that the commission did answer in Order 679. Again, is it for new joiners? Is it for existing members? Why is it for existing members? And what is it incentivizing or inducing someone to do? And the commission concluded, and I would note, it's not that the commission's interpretation has to be the best. We submit it was reasonable, but the commission clearly did not view...  What's that? Are you asking for deference? Well, first of all, we're just arguing that the statute is not plain, because the petitioner's theory of this case is that the commission has failed because the statute is plain. Well, the commission didn't think the statute was plain, and we do stand by that, and we do think that the commission... Is it ambiguous, or are you gap-filling, or what are we doing? What's that? I'm sorry? Is it ambiguous? Are we gap-filling? It is ambiguous. It is ambiguous. The language is ambiguous. The language is ambiguous, because incentives comes with a history out of the commission's own policies, but incentives, as the word, doesn't tell you everything you need to know about how this will be applied. And that's why there was so much discussion in Order 679 about how it would be applied. It doesn't even say that it would be an adder. It says an incentive. It's the commission that decided that that would be a 50-basis point adder, and it did that in the rulemaking, and it said, how are we... Is incentive ambiguous in the respect that we're talking about in this case as to whether it can be an incentive if it's something that you're already required to do? Yes. I mean, and that's why the commission talked about voluntariness and inducement, because it viewed incentives as only benefiting consumers if they're prospective and connected to the conduct that we want to induce. We want to induce you to not only join an RTO, but to stay in the RTO. And that was what the whole discussion in Order 679 was about, and the commission referred specifically to the fact that it was interpreting the statute more directly in Order 679A in paragraphs... to anybody that was a member. I mean, it was presumably you would get it or whatever, presumptive language, right? It's a... It wasn't until the Ninth Circuit decision that the flip occurred. Is that right? Well, because the... And the Ninth Circuit did not change the rulemaking in any way. It said that the commission's application of it had been plainly in error and against the regulation's own plain language. Frankly, the issue had hardly come up. These RTOs, I mean, I'm sorry, utilities would apply for the adder, and no one, as far as I'm aware, tried to rebut it until the California Commission tried in 2014. That's the first time the commission addressed it, and it got it wrong. The Ninth Circuit, in no uncertain terms, said that the commission had been plainly erroneous, wasn't abiding by its own regulation that said the presumption must be rebuttable. And because the whole presumption or the whole interpretation of incentives in 679 was based on prospective inducement, that the commission was wrong. Well, our orders go up on judicial review, and when a court tells us that we're plainly wrong in stark terms, the way the Ninth Circuit did, then we look at it, at what we did, and we conform to what courts instruct us to do. And we've adopted that because they were right. Again, the Ninth Circuit didn't modify the regulation in any way. It looked at what the commission itself had written and said, you're not applying it the way you wrote it. And now we are. So we stand by the rulemaking, and the commission did leave open the possibility that we might look at this again. It would be more appropriate, the commission said, if we were to do so, if we do a notice and comment rulemaking, rather than changing something about our regulation in individual adjudications. So the commission stands by the initial interpretation, and I do want to point to the paragraph seen in 679A that I wanted to note, paragraph 86 in 679A and also in 79, that's where the commission makes explicit that it's reading, it's interpreting section 219, and in paragraph 86 it talks about, based on a reading of section 219 in its entirety, and that's where it ties it back to part A with the focus on benefiting consumers. And that's how it all ties together with the way the commission was already looking at incentives and the way that it interpreted the ambiguous term incentives in the rulemaking. In order 679, I forget if it's A or not, the commission seems to take a pretty strong position rejecting comments that the adder shouldn't be available if it is mandated by statute or by other types of mechanism, and the commission says, no, we do this on a case-by-case, we come to the date and proceeding, and the date and proceeding we have language saying this is a prerequisite, that voluntariness is a prerequisite. That once challenged, that once someone has rebutted it with the argument that your participation, your continuing participation is not voluntary, that the presumption has been rebutted. And that does go to the Ninth Circuit's decision in looking at our order, which they hadn't changed. They said, how can you say that when someone rebuts the presumption with saying that your participation is not voluntary, if it's not voluntary, how can it be induced? And then how is it benefiting consumers if they're paying you an adder, which is just it's a profit adder, it's added money because the base return on equity is supposed to cover your costs and your ability to get investment. It is an adder to that. How do we justify the consumers paying that, because that is who pays it, if you're doing something you're already obligated to do and not something you're being incentivized to  And the commission said at one point that even if... Well, your opponent's thrust, if I can summarize, seems to be that what they wanted people, utilities to do was to increase investment and that somehow the adder would increase investment. They didn't want to encourage joining RTOs per se, but just because of the added investment. Well, it goes to it. There had been a push to try to get utilities to join these regional organizations for a lot of reasons that aren't just about building, although there are still ongoing conversations about building in the RTO context, there's a major rule-making that the commission's putting out in a couple weeks to encourage or to deal with regional transmission planning. But all of the incentives go to that in some respect. Subsection C is very specifically about joining an adder. I see that... You have extra time because your opponent had extra time, so keep going. And then I knocked myself right off my train of thought. I have the same question, so maybe I'll refresh your memory, but the argument of some of the utility companies seems to be here is that the RTO adder, regardless of whether you've joined or not, you've already joined, is providing some sort of inducement, is meeting that definition of incentive, is inducing you to, well, maybe to stay, yes, but to invest in infrastructure, invest in transmission infrastructure. Can you please respond to that argument that the adder somehow, you know, you have to spend more money in transmission infrastructure that you're induced or incentivized to do that by this adder? No, I don't think it's that direct. And as your honor noted previously, subsection B, a lot of these incentives, I mean, these are available to these utilities as well. It's not either or. Dayton did apply for several of these, and many utilities have taken advantage. Again, Order 679 wasn't just about 219C, obviously. It established what the D.C. Circuit in San Diego referred to as a palette of incentives. This incentive is about... Right, I see you saying that you think it's about joining, but could it provide an incentive for infrastructure? Could, based on your definition of incentive, like to induce? It provides, well, that's not how the commission looked at it. Because, no, it encourages you to be in the regional organization, and that may well have the effect of more building. Because, again, there are regional organization-wide... It's nothing about getting this adder requires you to build anything that you haven't already built. No. No. And, again, as far as building new things, there are a number of adders that might apply to this. This was specifically about trying to corral as many utilities as possible into these regional organizations. And, again, it's not just about the transmission building. That has been a big concern. But these regional organizations operate the grid in a more efficient manner than these... So FERC wants utilities to join RTOs. It certainly wants to encourage that, all the way back to the Order 2000 rulemaking, yes. And, again, there's a whole separate line of rulemaking that goes to encouraging transmission planning and investment in those regional organizations. But this adder is about encouraging and rewarding... Well, not... I don't want to say rewarding because it's for past conduct, but inducing utilities to stay in these regional organizations. And it doesn't even have to be the same one. As we see with Duke and American, they left the mid-continent independent system operator for PJM. I mean, it seems odd, though, that that incentive... I mean, the title of this whole thing is transmission infrastructure investment. I mean, it seems odd that you would bury just an incentive to join the regional organization in something that seems to be about investment in... Well, it is a step. Your involvement in these regional organizations will go toward more transmission infrastructure development. And the Commission had been offering... I'm sorry. But, I mean, it just seems like kind of a second order... Okay, yes, it's kind of a link in the chain. But it just seems oddly placed to me in this statutory scheme. There seem to be other places in the statute that deal specifically with RTOs. Well, this rulemaking or this legislation in 2005... Well, this provision... The Commission, again, had been experimenting with rate incentives. But it hadn't gone maybe as far... Or maybe we don't have a lot of legislative history on this section. But this formalized some of the things the Commission had already been doing. Some of these kinds of incentives, the Commission had been approving as a matter of policy. I think they had been allowing for some RTO adders. There's a reference in Order 679A where the Commission had actually denied incentives to someone to stay in an order that preceded this. And the Commission said, well, that's over. We disown the... This is in footnote 142 in paragraph 86. So it had been doing something along these lines before, but not in this large formal rulemaking that the Congress... I mean, the whole point of this was you need to do a rule in the next year, which the Commission did. Is there a problem with saying that we want to encourage people, people meaning utilities, to join RTOs? And therefore we're going to give the adder when you join voluntarily. But we're not going to give you the adder if you're forced to join because the state has a statute that says you must join. Why wouldn't there... Shouldn't there be an equal incentive for utilities that are forced to join as utilities that choose to join? Because they're not being induced to do it by the adder. They're being obligated to do it by... So it would be just like an unwarranted benefit. Well, and the focus is not the unwarranted benefit. It's the unwarranted obligation to the consumers to pay it. What are the consumers paying for, and what are they getting for what they're paying? And if we're paying you a reward to do the thing that you were already obligated to do, you weren't induced to do it by the incentive, but you were obligated to do it, then we're saying consumers just have to pay for that, and they really didn't pay for anything. And that's the Commission's logic on that. And the utilities are already entitled to an equitable rate of return. The adder is just added to that rate of return. That's absolutely right, yes. And they could, again, still be applying for other adder. Some of the other incentives offer an inflated... I don't mean inflated in a pejorative way, but an enhanced return on equity under other incentives that are available. And then there are things like the construction while in progress and the abandonment incentive and things that aren't about return on equity. So there are other ways that you could get more money for building new transmission. But this specific adder, yeah, it's a little gravy. It is an incentive for you to join an RTO and stay in an RTO and get more than you would get on the return on equity. Because, yes, the base return on equity has to be designed to support, I forget the exact language the Commission said, but your return on equity is not leaving you in a deficit. And it provides for some profit. It's not making a utility a nonprofit. They're still getting a profit. This is just an added profit that's meant to be an incentive. I take it if your friend's reading is right and the incentive is not about joining, but the incentive is about transmission, infrastructure, and investment, you would need to promulgate regs on that to implement? Or is that implemented now? Well, first of all, I don't know how we would get that from a plain reading that the incentive is for building. Because that's not in Section C at all. Right. I'm just saying, let's assume his argument is correct. I assume the agency would have to do something to further implement that reading. You're saying the agency's reading right now is the incentive is solely related to joining and incentivizing joining the RTO? C is, yes.  C, paragraph whatever of 679A, all this stuff. Is there some regulatory infrastructure built around that assumption? If it were changed, would something change? Order 679 was, the parts of Order 679 that talk about 219C are based on our reading, that it's about the joining and the remaining. There are certainly other parts of 679 that I don't have with me that talk about all the other incentives. But you say this adder must be used to invest in, I mean, whatever, I don't know. It must use X amount of something to invest. Because this incentive is related to the infrastructure investment, we will propagate a reg that will force you to use some of your investment in some specific way. I would certainly end up standing in front of a court of appeals trying to explain how the commission mandated how investor-owned utilities use their own profits, which we don't see the statute as saying you have to use this adder. Certainly you would be incentivized to do that. But the adder is not tied to making investments. No, it is encouraging you to be in an RTO, which is going to result in more investment. It is a chain of inducement. It is a chain of incentive. It is not a chain of mandating in that regard. Any further questions? No. Thank you so much. Thank you. May it please the Court, I am Thomas Lindgren representing the Public Utilities Commission of Ohio and its Federal Energy Advocate. Your Honor, the Fort correctly declined to reach the preemption issue because it lacked the authority to consider constitutional issues. While this Court certainly has that authority, it may decline to reach the issue of preemption and probably should because there is no complete agency record to review. Well, if we decline to reach it, what should happen to the preemption issue? Should it go back to FERC? I believe you could resolve this without considering it. I would point out that if the petitioners here wish to challenge the statute on constitutional grounds, they can do that in district court. They can seek an injunction or a declaratory judgment that the statute is unconstitutional. And if we don't think that is the appropriate method, would you suggest that we remand the issue for FERC to opine upon before reaching the issue? Well, Your Honor, I believe FERC is under the impression they don't have the authority to do that. I would say if you do decide to reach the issue of preemption here, you should find it's not preempted. There's neither conflict preemption nor field preemption here. Your Honor, the regulation of electricity is a shared function between the federal government and the states. It has been for over a century. The state statute here, 4928.12, is one that complements the federal scheme. It doesn't contradict the federal scheme. There's a Supreme Court precedent that there should be a high bar for finding preemption, and that's particularly true when you're considering the exercise of a state's police powers, like utility regulation. There's a presumption against finding preemption unless there's clear congressional intent to preempt here, and there is not. Your Honor, you're talking about the area of the field as the regulation of electricity generally, right? My understanding of the utilities argument here is that the preempted field is just the regulation of interstate transmission, their rates or facilities. They're not making such a broad argument about the regulation of the energy sector whatsoever. And they point to the fact that Congress has given them jurisdiction over interstate transmission. So if we can focus your argument on that aspect. Certainly, Your Honor. Yes, it is true that Congress has delegated too far authority over most of the transmission system. However, Congress has explicitly reserved certain areas for state authority, like the intrastate transmission and transmission for consumption by the transmitter. So Congress has not totally occupied this field. There's still some room for states to operate here, and Ohio has exercised its authority to require utilities doing business in Ohio to join a regional organization, one that has already been approved by FERC. So there's no stepping on toes here. We're not interfering with anything that... What do we do with the Hughes case that talked about wholesale rates preemption? Well, Your Honor, one clear distinction between Hughes is that, again, it was an action brought in district court that sought an injunction. Also, the Hughes case concerned a state system or scheme that would interfere with what FERC is trying to do as far as wholesale auctions. There's no interference here with what FERC is doing. The state merely requires utilities to do what FERC is already encouraging, which is joining an organization to promote the planning and transmission expansion. Could there be aspects of the RTO that is in Ohio that could conflict with FERC policies or provisions? I don't believe so, Your Honor. I believe it's perfectly consistent with FERC's policy to encourage joining one of these organizations. And hypothetically, if there were some such conflict, would the appropriate time to decide whether there's conflict preemption be in a separate proceeding making those allegations? I would say yes, Your Honor, where that record could be fleshed out. So if we were to say that the Ohio statute is not preempted here, that would not bar a later case from raising some conflict that would lead to conflict? No, I don't believe it would, Your Honor. That could be raised in a separate proceeding under the appropriate circumstances. I see my time has expired. Thank you very much. Do you have a view on 824A1? I mean, it seems to me to generally talk about voluntary coordination, and isn't Ohio's law interfering with that by mandating it? Well, Your Honor, Congress has made clear that FERC may not mandate joining one of these organizations, but it didn't say anything about states being able to mandate or not being able to mandate joining. So I don't see any conflict there. Okay, but the logic is a state can't prevent somebody from joining. Is that right? That is correct, yes. Okay, but a state can force somebody to join? Yes, and that's often the case. Isn't it the same? I mean, I'm just looking at the same. If we're saying a state can't prevent somebody from joining, that would implicate 824A1, right? Because, I mean, it just seems to be they're both kind of implicated by the same statutory provision because it just generally says preventing the voluntary coordination, whatever it is. I mean, mandating seems to be also interfering with voluntary coordination. Your Honor, in many cases, courts have upheld state statutes that are stricter than a federal requirement. States can go above and beyond what the federal law requires, and you just can't go below it, and that's what Ohio has done here. Can I ask you one more question? Do you view the Ohio law as targeting and being about interest rate transmission and what the state of Ohio wanted to do in terms of regulation of transmission within state, which, as you said before, they have power to do? Well, Your Honor, I believe the intent of the statute is to ensure reliable service for customers in Ohio, and our General Assembly believe that the best way to do that would be to acquire utilities operating in Ohio to join one of these regional organizations that dispatches power and plans for transmission expansion. Thank you. Thank you. Your Honor, may it please the Court. To start with the statute, the statute doesn't say to join. It doesn't say join voluntarily. It says to each that joins. So if you just look at the text, the text supports our position. The question then is, is there something else in the statute that warrants ignoring that text and adding something into the statute that isn't there, the word to or the word voluntarily? It's making use of the word incentives. Right, but my interpretation also makes full use of the word incentives, and this is just really critical, so I want to make sure that we're not talking past each other. The way the statute induces anything, and we can talk about what it's inducing, but the way it induces anything is by making transmission investment more profitable. That's what an ROE adder does. It makes your transmission investment more profitable. Instead of earning a 9% return on your investment, you earn a 9.5% return. So that is what this does. And now the question is, what's being induced? Is there a reg or something that specifically talks about the investment that has to be made? No, I mean... When you're talking about transmission investment, you're just talking about general power plant and things that... Well, lines. I mean, we have a weight base, okay? So we invest capital, and then we go to FERC and say, we're entitled to a regulated return on our invested capital. And FERC says, okay, what should the return be? You can earn a 9% return. You can earn a 9.5% return. That's how the industry works. That's how the industry makes money. But I guess what I'm saying is, I don't see the... In your view, where's the incentive? Like, you're saying I get a higher return, but I'm getting a higher return because I belong to this organization, and then... So the incentive is... If I invest more, I get more money, but that's not exactly the way... Well, sure it is. So let me explain. Here's my view of an incentive. I would say to you, if you build $100 million in power plant, I will give you X dollars in rebate to incentivize you to do that, right? That's an incentive. That's a specific tie to me telling you what I want you to do, and then you get the money for it. Here, it seems like I'm joining this group, I get this added money, and then it makes sense for me to put more money into it, because then I'll make more. Let me give you an example from Ohio Power, one of my clients. Ohio Power, it owns transmission lines, it owns distribution facilities, which are state regulated, that have a different return, and it also has investors. It has money that it can... It has capital. It needs to decide, well, how do we want to deploy that capital? Should we pay dividends to our parent company? That's one way of spending our money. Should we invest in state regulated distribution facilities? That's another way of spending our money. Or should we invest in federally regulated transmission facilities? That's another way of spending our money. So what should we do? Well, we're going to look at the relative returns and the relative economic benefits of those different courses of action when making our decision. And so when FERC comes and says, or Congress comes and says, hey, when you put that money in transmission facilities instead of paying dividends or investing in distribution lines, when you put that money in transmission facilities, we're going to actually pay you more than we would if you weren't in the RTO. We're going to pay you more. And that way you have a reason to spend that money on transmission facilities instead of these other reasons, instead of these other modes. That's what Congress was trying to do in this whole statute, Section 219. And that's what Subsection A makes clear and what Subsection B makes clear. But I guess I'm not following that they're saying that clearly. They're saying, why tie it to whether you're a member of the RTO then and not to how much money you're investing in transmission facilities? They're tying it to the membership. Now, I don't know if that necessarily answers the question. I don't know. But that seems like an odd way to do an incentive that's specifically for investing in power plant infrastructure. There's no doubt that FERC and Congress liked RTOs and wanted to encourage voluntary membership in them. There's no doubt about that. But it didn't want to limit this incentive to build more stuff just for utilities that voluntarily joined. It wanted all members of RTOs to get the benefit of this so that all members of the RTOs would have an extra reason to put their capital in transmission instead of in other things. And that's the statute. That's what the plain text of Section 219 says. And I'm giving you a plausible and I think right reason that connects that with the rest of the statute, whereas my opponents have to add in words to the statute in order to make sense of their interpretation. So we think we have the better of the argument on that subject. Can I just try and retrace your steps of how the incentive works to try and see if I understand your argument? It's that you're going to get more money for your rates on transmission. So now as your company is making, or the various companies you represent are making decisions about how to invest, you're more likely to invest in transmission because then you will be selling more of it and you can sell more of it at higher rates. Then we'll build more of it. We're not required to make the choice to build more. You'll make the choice to build more of it because then you can sell more of it at higher rates than you would have otherwise. We get the choice to build more of it. Once we build it, we're entitled to recover a profit, a return. It's a regulated industry where... So once you build it, you're going to just... Once we build it, then we get 9.5% profit instead of 9% profit. That's what the statute does. Once we make the choice to build it, we are going to get a little bit more than we would have otherwise gotten. All the incentives are doing that. All the incentives that FERC enacted and that Congress enacted under the statute make it more economically attractive to put your capital into transmission infrastructure as opposed to other things. It makes it more attractive, but you also get the adder, the additional money for what you already have regardless of whether the company actually makes that choice or not. That's right. That's the way Congress structured it. That's right. Thank you. Your time is up. Thank you so much, Your Honor. I appreciate it. Thank you both or all for your argument. The case will be submitted.